FILED

Jan 24 2023

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>The Premises Located at<br>2311 Homeview Drive<br>Henrico, Virginia 23294 | Case No. 3:23-sw-_8_____<br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Kathryn Weber, am a Special Agent with the Federal Bureau of Investigation (FBI),

being duly sworn, depose and state as follows:

**INTRODUCTION**

1.      I have been employed as a Special Agent with the FBI since 2012.  I am currently

assigned to the Richmond Field Office investigating crimes against children.  While employed

by the FBI, I have investigated federal criminal violations related to child exploitation, child

pornography, civil rights, white collar crimes, and others.  I have gained experience through

training provided by the FBI and everyday work relating to conducting these types of

investigations.  I have received training in the area of child pornography and child exploitation

and have had the opportunity to observe and review numerous examples of child pornography

(as defined in 18 U.S.C. § 2256) in all forms of media including computer media.  Moreover, I

am a federal law enforcement officer who is engaged in enforcing the criminal laws, including

18 U.S.C. §§ 2251, 2252 and 2252A, and I am authorized by law to request a search warrant.

2.      This Affidavit is submitted in support of an application under Rule 41 of the

Federal Rules of Criminal Procedure for a search warrant for the locations specifically described

in Attachment A of this Affidavit, including the entire property located at 2311 Homeview

Drive, Henrico, Virginia 23294 (the "SUBJECT PREMISES"), and the content of electronic

storage devices located therein, for contraband and evidence, fruits, and instrumentalities relating

to violations of federal criminal statutes including knowing distribution and receipt of child

pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A), and knowing possession of, and access

with intent to view, child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) ("the

SUBJECT OFFENSES"), which items are more specifically described in Attachment B of this

Affidavit.

      3.    The statements in this Affidavit are based in part on information provided by

other sworn law enforcement officers participating in this investigation and on my investigation

of this matter.  Since this affidavit is being submitted for the limited purpose of securing a search

warrant, I have not included every fact known to me concerning this investigation.  I have set

forth only the facts that I believe are necessary to establish probable cause to believe that

contraband and evidence, fruits, and instrumentalities relating to the SUBJECT OFFENSES are

presently located at the SUBJECT PREMISES.

## STATUTORY AUTHORITY

      4.    As noted above, this investigation concerns alleged violations of the

following:

      a.    18 U.S.C. § 2252A(a)(2)(A) prohibits a person from knowingly receiving or

distributing, or attempting or conspiring to receive or distribute, any child

pornography or any material that contains child pornography, as defined in 18

U.S.C. § 2256(8), that has been mailed, or using any means or facility of interstate

or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

b.     18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## **DEFINITIONS**

5.     The following definitions apply to this Affidavit and Attachment B:

a.     "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors in sexually explicit poses or positions.

b.     "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct,

or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

c.    "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices.  *See* 18 U.S.C. § 1030I(1).

d.    "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

e.    The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

f.     "Internet Protocol address" or "IP address," as used herein, refers to a unique number used by a computer or other digital device to access the Internet.  IP addresses can be "dynamic," meaning that the internet service provider (ISP) assigns a different unique number to a computer every time it accesses the Internet.  IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.  For many years the primary format for network addresses was Internet Protocol version 4 (IPv4), which is a 32-bit number comprised of four "octets," e.g., 192.26.158.1.  Because of the growth of the Internet and the depletion of available IPv4 addresses, in the mid-2000s network providers began using a new version of IP address known as IPv6, which is a 128-bit combination of alphanumeric characters, e.g., 2345:0425:2CA1:0000:0000:0567:5673:23b5.

g.     "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

h.     "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

i.     "Records," "documents," and "materials," as used herein, include all information recorded in any form and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

j.      "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or

simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-

genital, or oral-anal, whether between persons of the same or opposite sex; (b)

bestiality; (c) masturbation; (d) sadistic or masochistic abuse; I(e) lascivious

exhibition of the genitals or pubic area of any person.

k.      "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film

and videotape, data stored on computer disc or other electronic means which is

capable of conversion into a visual image, and data which is capable of

conversion into a visual image that has been transmitted by any means, whether or

not stored in a permanent format.

## BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

6.      The instant investigation involves a user of "Freenet."  Freenet is an Internet-

based, peer-to-peer (P2P) network that allows users to anonymously share files, chat on message

boards, and access websites within the network.  Law enforcement agents have been

investigating child pornography trafficking by Freenet users since at least 2011.

### Background Regarding Freenet

7.      In order to access Freenet, a user must first download the Freenet software, which

is free and publicly available.  The Freenet "source code" — i.e., the computer programming

code that enables Freenet's operation – is also publicly available.  In other words, Freenet is

"open source" software that may be examined and analyzed by anyone with the pertinent

expertise or knowledge.  There is also a Freenet Mobile app that may be installed on Android

mobile phone devices.

8.      Anyone running the Freenet software may join and access the Freenet network. Each computer running Freenet connects directly to other computers running Freenet, which are called its "peers."[1]  When installing Freenet, each user agrees to provide to the network a portion of the storage space on the user's computer hard drive, so that files uploaded by Freenet users can be distributed and stored across the network.  Freenet users can upload files into the Freenet network and download files from the Freenet network.  After a user installs Freenet on their computer, the software creates a default "download" folder.  If a user successfully downloads a particular file from Freenet, Freenet may save the content of that file to the "download" folder. A user may change this default setting and direct the content to be downloaded elsewhere.

9.      When a user uploads a file into Freenet, the software breaks the file into pieces called "content blocks" or simply "blocks."  Each of these blocks is encrypted by the Freenet network.  The encrypted pieces of the file are then distributed randomly and stored throughout the Freenet network of peers.[2]  The software also creates an index piece called the "manifest block" that contains a list of all the pieces of the uploaded file.  The manifest block also contains an encryption key for each of the file's content blocks.  The manifest block is accessed within Freenet through the use of a unique manifest key (also known as a key,) which is created at the

---

[1] The number of peers is determined by the user's settings and is based on the quality and speed of the user's upload bandwidth that the user allocates to Freenet.

[2] Because the pieces of files are encrypted, a Freenet user is unable to access the content of pieces that are stored on the user's own computer hard drive because they are not in a readable format.

time of the manifest block's creation, contains a series of letters, numbers, and special characters, and is used to download the file from Freenet.[3]

10.    In order to download a file on Freenet, a user must have the key for the file. There are a number of ways that a Freenet user can download a file using a key. Some examples include: (1) the "download" box on Freenet's "file sharing" page; (2) the "download" box on the message board associated with Freenet or other Freenet add-on programs; and (3) directly through the user's web browser while the user is connected to the Freenet network.

11.    When a user attempts to download a file via Freenet, Freenet downloads the piece of the file containing the index, which provides the information required to retrieve the individual pieces of the file. The Freenet software then requests all of the pieces of the file from the user's peers. Rather than request all of the file pieces from a single peer, requests for file pieces are divided up in roughly equal amounts among the user's peers. If a user's peer does not have the particular requested pieces in its storage, that peer will then divide up and ask its peers for the pieces, and so on. For example, if User "A" has 10 peers and requests 1000 pieces of a file, roughly 100 pieces are requested from each one of User A's peers. See Figure 1.

---

[3]An example key is: CHK@0R6h6o8a~JbOGg8GmxGauRyqJPSwcHGmxGauLznw8Fey
B0go,08agxRpNx~wc~rmZRfWQaSed3HTeKKkXAwvDRF2LUaU,AAMC--8/lolitaz49.avi.



Freenet User A is connected to 10 peers.

User A wants to download a file that requires 1000 pieces to rebuild the file.

Because the User A has 10 peers, roughly 100 pieces are requested from each one of user A's peers.

Figure 1

If Peer "B" receives User A's request for 100 pieces of the file but does not have any of those pieces in its storage Peer B forwards on the request for those pieces to Peer B's peers. If Peer B has 10 peers of its own, roughly 10 pieces are requested from each one of Peer B's peers. See Figure 2.



Peer B receives user A's request for 100 pieces of the file. Peer B does not have any of the pieces in its storage.

Peer B forwards on the request for pieces to each one of its peers.

Because B has 10 peers, roughly 10 pieces are requested from each one of B's peers.

Figure 2

As noted below, this design can help law enforcement distinguish between a Freenet user that is the original requestor of a file, and one that is merely forwarding the request of another user.

12.    To prevent requests for pieces from going on indefinitely, Freenet is configured to only allow a request for a piece of a file to be forwarded to another peer a limited number of times (the default maximum is 18). This limit is called "hops-to-live." If a request reaches that limit without finding the requested piece, a signal is returned to the user's computer and the request is sent to another of the user's peers. The remaining number of times a request for a piece may be forwarded is included within the request for that piece.

13.    Freenet attempts to hide which computer uploaded a file into or downloaded a file from the network by making it difficult to differentiate whether a request for a piece that comes in from a peer originated with that peer (i.e., the peer was the "original requestor" of the file), or whether that peer was simply forwarding a different peer's request. Freenet attempts to hide the

identity of the original requestor by randomizing the initial number of times a request can be
forwarded from one peer to another, i.e., "hops-to-live," to be either 17 or 18.  Without this
randomization, any time a user received a request for a piece of a file that could be forwarded 18
times, the user would know that its peer was the original requestor of the file.  This design allows
investigators using Freenet to focus investigative efforts on peer computers that request pieces of
files of interest that may be forwarded 17 or 18 times, in order to determine whether the peer was
the original requestor of the file.

14.    Freenet has two operational modes, "Darknet" and "Opennet."  On the Darknet
mode, a computer connects only to peers whom the user has specifically selected.  On the
Opennet mode, a computer may connect to peers unknown to the user.  A Freenet user may
choose which mode to use.  The mode relevant to this investigation involves a user who chose to
use the Opennet operational mode.

15.    Freenet warns its users in multiple ways that it does not guarantee anonymity:
when Freenet software is initially installed; within the log file each time Freenet is started; and
via Freenet's publicly accessible website.  Freenet software also does not mask a computer's IP
address:  the IP addresses of each Freenet user's peers are observable to the user.  For example, if
a user is connected to 10 peers on Freenet, all 10 of those peers' IP addresses will be observable
to the user.  The fact that Freenet does not mask IP addresses is explained on its publicly
accessible website.  Freenet also acknowledges on its publicly accessible website that, for users
who use the Opennet mode, it can be statistically shown that a particular user more likely than
not requested a file (as opposed to having merely forwarded the request of another peer) based

on factors including the proportion of the pieces of a file requested by a user and the number of nearby peers.

### Child Pornography Images/Videos on "Freenet"

16.    Freenet can be used to advertise and distribute images and videos of child pornography.  Unlike other file sharing systems, Freenet does not provide a search function for its users whereby users would insert search terms to locate files.  A user who wishes to locate and download child pornography from Freenet must identify the key associated with a particular child pornography file and then use that key to download the file.

17.    Freenet users can identify those keys in several ways.  For example, "message boards" exist on Freenet that allow users to post textual messages and engage in online discussions involving the sexual exploitation of minors.  Law enforcement agents have observed message boards labeled with terms known to be associated with child pornography, including: "pthc" (an acronym for "pre-teen hard core"), "boy porn," "hussy," "pedomom," "kidfetish," "toddler_cp," "hurtcore," and "tor-childporn."  Typical posts to those message boards contain text, keys of child pornography files that can be downloaded through Freenet, and in some cases descriptions of the image or video file associated with those keys.

18.    Freenet users can also obtain keys of child pornography images or videos from websites that operate within Freenet called "Freesites."  Freesites can only be accessed through Freenet.  Some of those sites contain images of child pornography the user can view along with keys of child pornography files.  It is also possible that Freenet users may obtain keys related to child pornography images or videos directly from other Freenet users.

## **Investigation into the Trafficking of Child Pornography on Freenet**

19.     Since approximately 2011, law enforcement has been investigating the trafficking

of child pornography on Freenet.  A modified version of the Freenet software is available to

sworn law enforcement officers to assist in conducting Freenet investigations.  I have been

trained on the operation of the modified law enforcement version of Freenet.  This law

enforcement version is nearly identical to Freenet, except that it allows a computer operated by a

law enforcement officer to automatically log information about requests for pieces of files

received directly from its peers.  The types of information logged by a law enforcement

computer are available to all standard Freenet users as part of Freenet's normal operation.  This

information includes but is not limited to: the IP addresses of the user's peers; the number of

peers those peers report to have; a unique identifier assigned by the software (referred to as the

computer's Freenet "location"); the remaining number of times a request for a piece of a file may

be forwarded; the date/time of requests received from a peer; and the digital hash value of a

requested piece.

20.     Law enforcement computers do not target specific peers on Freenet nor do law

enforcement computers solicit requests from any peers.  The Freenet information collected by

law enforcement computers is logged and provided to other Freenet-trained law enforcement

personnel to further investigations into Freenet users believed to be downloading child

pornography files through Freenet.

21.     Law enforcement officers collect keys associated with suspected child

pornography files that are being publicly shared and advertised on Freenet.  Law enforcement

only investigates Freenet users who request pieces of files associated with such keys collected by

law enforcement.  The keys collected by law enforcement have been obtained via publicly accessible sites, such as Freenet message boards and Freesites, as well as during prior investigations into child pornography trafficking on Freenet.  This investigation pertains to child pornography files with known keys, the content of which are further described below.  Those files are referenced as "files of interest."

22.     By viewing the documented activity of a peer that sends a request to a law enforcement computer, it is possible to determine whether it is significantly more probable than not that the peer is the original requestor of a file of interest.  Only those requests that were intended for law enforcement computers as recipients, that may be forwarded 17 or 18 times, and are associated with a file of interest are analyzed.  A mathematical formula is then applied to determine the probability of whether the number of requests received for pieces of a file is significantly more than one would expect if the peer were merely forwarding the request of another computer.

23.     Freenet has also been the subject of scrutiny by academia.  Pertinent to this affidavit, I have studied a peer-reviewed, publicly available academic paper written by researchers from the University of Massachusetts Amherst and the Rochester Institute of Technology[4], (hereafter "the Academic Paper").  The Academic Paper describes the operation of the Freenet network and the methodology the researchers applied to derive a mathematical formula for estimating the likelihood that a user or "node" on Freenet is the original requestor of

---

[4] Brian Levine, et al., *A Forensically Sound Method of Identifying Downloaders and Uploaders in Freenet*, CCS '20: Proceedings of the 2020 ACM SIGSAC Conference on Computer and Communications Security, October 2020, Pages 1497–1512, https://doi.org/10.1145/3372297.3417876.

a particular file.  Before discussing the basics of their methodology, several points are important

to note.  The Academic Paper's researchers conducted a four-year study during which they

monitored the flow of file requests on Freenet.  Working with law enforcement officials to

confirm the contents of files that were requested, the researchers determined that at a minimum

30% of Freenet's traffic is related to child exploitation material.  The researchers developed their

methodology based on the *Daubert* standard for forensic soundness.  Members of the research

team have testified in multiple federal criminal cases during motions to suppress.  In cases where

the search warrant was contested, all of the district courts have denied the defendants' motions to

suppress.[5]

24.    In basic terms, the methodology relies on two primary facts about the Freenet

software.  First, the original requestor divides up its requests for pieces of a file among its peers,

sending a roughly equal fraction of the requests to each peer.  Second, if a peer does not have the

requested pieces, the peer takes the fraction of requests for pieces of a particular file and divides

them up again among its own peers.  *See* Figures 1 and 2.  Because a peer that is merely routing

another peer's request would ask its peers for a significantly smaller portion of the pieces of a

file than an original requester, it is possible for the recipient of requests to determine whether a

request is significantly more likely than not from an original requestor.  The academic paper's

---

[5] *United States v. Dickerman,* 954 F.3d 1060 (8th Cir. 2020), (district court denied motion to
suppress, finding both probable cause and alternatively good faith; Eight Circuit did not reach
the issue of probable cause and affirmed on good faith grounds); *United States v. Hall*, Dist. of
Maryland, Case 1:16-CR-469, (motion to suppress denied); *United States v. Popa*, Northern Dist.
of Ohio, Case 5:18-CR-448 (motion to suppress denied)); *United States v. Rogers*, Northern Dist.
of Ohio, Case 3:18-CR-26 (search warrant uncontested; defendant admitted to downloading on
Freenet and convicted at trial by a jury); *United States v. Weyerman*, Eastern Dist. of
Pennsylvania, Case 2:19-CR-88 (motion to suppress denied).

detailed evaluation finds that a mathematical formula based on this reasoning is highly accurate (specifically, it has a high true positive rate and a very low false positive rate).[6]  The statistical algorithm developed by the researchers has been incorporated into a spreadsheet-based tool used by law enforcement officials.  Using this spreadsheet tool with its built-in formulas, investigators can assess the likelihood that a particular user is the original requester of a known child pornography file.  Based upon my training and experience, I believe this to be a reliable method to determine whether it is significantly more probable than not that a given Freenet computer is the original requestor of a file of interest.

25.    I am also aware through my training and experience that dozens of searches of digital devices have been conducted by law enforcement officers (either through court-authorization or consent) related to targets whose IP addresses were identified based upon analysis of information from Freenet law enforcement computers.   For the searches I am aware of, to the best of my knowledge they all yielded evidence of child pornography possession and/or trafficking.

## Requests Targeted in the Instant Investigation

26.    I have reviewed information obtained and logged by law enforcement Freenet computers related to IP addresses 73.147.99.35 and 2601:5c2:8600:234:d2a:ae59:1066:3a8f.  Such information shows that a Freenet user with IP addresses 73.147.99.35 and 2601:5c2:8600:234:d2a:ae59:1066:3a8f requested pieces of the child pornography files described below from a law enforcement Freenet computer.  With respect to each file – considering the number of requested file pieces, the total number of file pieces required to

---

[6] Your affiant can provide a copy of the Academic Paper to the Court upon request.

assemble the file, and the number of peers the user had – the number of requests for file pieces is

significantly more than one would expect to see if the user of IP addresses 73.147.99.35 and

2601:5c2:8600:234:d2a:ae59:1066:3a8f were merely routing the request of another user.

Accordingly – based on my review of those records, the application of the methodology

described in paragraph 23, my understanding of Freenet, my training and experience, and the fact

that the same user requested pieces of multiple child pornography files – I believe that the user of

IP addresses 73.147.99.35 and 2601:5c2:8600:234:d2a:ae59:1066:3a8f was the original

requestor of each of the described files.

    27.     On May 29, 2021, between 7:14 PM UTC[7] and 10:22 PM UTC, a computer

running Freenet software, with an IP address of 73.147.99.35, with an average of 25.7 peers,

requested from a law enforcement computer 53 pieces out of 1,550 total pieces needed to

assemble a file with a SHA1 digital hash value of

DBFVRTSZ2AURO32P6LSQWBD7YDTYXKIQ.[8]  I have downloaded the exact same file with

---

[7] Coordinated Universal Time or UTC is the primary time standard by which the world regulates
clocks and time.  It is within about 1 second of mean solar time at 0° longitude and is not
adjusted for daylight saving time.  It is effectively a successor to Greenwich Mean Time (GMT),
which is a time zone used by a few countries in Africa and Western Europe, including the UK
during winter.

[8] "SHA1" stands for "secure hash algorithm – 1" and refers to a particular type of cryptographic
hash value.  Hash values can be thought of as fingerprints for files.  The contents of a file are
processed through a cryptographic algorithm, and a unique numerical value – the hash value - is
produced that identifies the contents of the file.  Hash values are widely used in computer
programs and digital technologies to verify data file identity and integrity.  Hash values are
unique, and the possibility of two different files having the same hash value, something called a
"hash collision," is staggeringly small.  Hash files are also reproducible, i.e., the same file, if
unaltered, will always generate the same hash value when the same hash algorithm is used.  But
if the contents are modified in any way, the value of the hash will also change significantly.
There are several types of hash algorithms, including MD-5, SHA-1, and SHA-256, to name a
few.

the above referenced SHA1 hash value from Freenet.  It is a video approximately 45 seconds in duration titled "4yo Blonde Daughter anal very good.MP4."  The video depicts a female minor and an adult male.  Based on my training and experience, the child is prepubescent and appears to be 3 to 5 years old.  The child is standing on a toilet facing the wall with pants pulled down.  The adult male begins rubbing his penis between the child's buttocks and on the child's genitals from behind.  The adult male appears to attempt to insert his penis into the child.

28.    On August 6, 2021, from 2:09 PM UTC through 4:22 PM UTC, a computer running Freenet software, with the IP address of 2601:5c2:8600:234:d2a:ae59:1066:3a8f, having an average of 34.9 peers, requested from a law enforcement computer 340 pieces out of 15,670 total pieces needed to assemble a file with a SHA1 digital hash value of HCCBSQJJXD3VCRZTSEDEGOZ6TEXQEXME.  I have downloaded the exact same file with the above referenced SHA1 hash value from Freenet.  It is a video approximately 16 minutes and nine seconds in duration titled "Tricota.avi."  The video depicts an unclothed, female minor lying on a bed with two unclothed males.  Based on my training and experience, the female child is prepubescent and appears to be 4 to 6 years old.  Throughout the video, one of the males uses the child's hand to masturbate his penis and also inserts his penis into the child's mouth.  The other male uses his hand and mouth to perform sexual acts on the child's genitals and appears to attempt to insert his penis into the child's vagina and anus.

29.    On August 6, 2021, between 5:08 PM UTC and 5:15 PM UTC, a computer running Freenet software, again with an IP address of 2601:5c2:8600:234:d2a:ae59:1066:3a8f, with an average of 35.0 peers, requested from a law enforcement computer 33 pieces out of 834 total pieces needed to assemble a file with a SHA1 digital hash value of

5X3VZNL2Y72TMSPU5RY2DL2KRLUGMX44.  I have downloaded the exact same file with the above referenced SHA1 hash value from Freenet.  It is a video approximately five minutes and 27 seconds in duration titled "7.avi." The video depicts a naked, female minor sitting on a bed facing the camera.  Based on my training and experience, the child is prepubescent and appears to be 6 to 8 years old.  Throughout the video, the child uses her hand to masturbate her vagina in view of the camera.  The child eventually faces away from the camera with her vagina and anus in view of the camera and continues to masturbate.

30.    The fact that a Freenet user requested pieces associated with a particular file on Freenet indicates that the user attempted to download the file's contents from Freenet.  It does not indicate whether or not the user successfully retrieved all of the necessary pieces to successfully download the file.

31.    The keys for each of these files were obtained by law enforcement agents at some point between 2011 and the present date.  The source for these file keys was either from a Freenet message board or Freesite that contained information related to the sexual exploitation of children, or from a previous investigation.  I am not aware of how, or from where, this particular Freenet user obtained the keys used to attempt to retrieve the files of interest described.

### Identification of the SUBJECT PREMISES

32.    Using publicly available search tools, law enforcement determined that IP address 73.147.99.35 was controlled by Internet Service Provider ("ISP") Comcast Cable Communications.

33.    On or about August 20, 2022, an FBI administrative subpoena was served on Comcast Cable Communications for subscriber information relating to the use of IP address

73.147.99.35 between April 3, 2022, at 10:02:10 UTC and May 29, 2022, at 22:22:40 UTC. A review of the results obtained on or about September 2, 2022, revealed the account holder David Timberlake, with a service and billing address of 2311 Homeview Drive, Henrico, Virginia 23294, which is the SUBJECT ADDRESS, as being associated with IP address 73.147.99.35 from March 6, 2022, through August 20, 2022.

34.    Using publicly available search tools, law enforcement determined that IP address 2601:5c2:8600:234:d2a:ae59:1066:3a8f was controlled by Internet Service Provider ("ISP") Comcast Cable Communications.

35.    On or about October 17, 2022, an FBI administrative subpoena was served on Comcast Cable Communications for subscriber information relating to the use of IP address 2601:5c2:8600:234:d2a:ae59:1066:3a8f on August 6, 2022, at 14:09:07 UTC, 16:22:26 UTC, 17:08:20 UTC, and 17:15:32 UTC. A review of the results obtained on or about November 14, 2022, revealed the account holder David Timberlake, with a service and billing address of 2311 Homeview Drive, Henrico, Virginia 23294, which is the SUBJECT ADDRESS, as being associated with IP address 2601:5c2:8600:234:d2a:ae59:1066:3a8f since August 6, 2022, at 04:00:00 UTC through August 7, 2022 at 03:59:59 UTC.

36.    A check of publicly available databases revealed that David Timberlake resides at the SUBJECT PREMISES.

37.    A check of Henrico County real estate records on or about December 27, 2022, listed the current owner of the SUBJECT PREMISES as David Timberlake since March 28, 2001.

38.     A check with the Department of Motor Vehicles (DMV) on or about December 27, 2022, resulted in no additional information regarding David Timberlake.

39.     A check with the Virginia Employment Commission (VEC) for Timberlake on or about December 27, 2022, resulted in the identification of Timberlake's employer as West End Trophies and C.P. Dean as of Quarter 3, 2022.

40.     Periodic surveillance of the SUBJECT PREMISES from November 15, 2021, through May 24, 2022, did not result in the positive identification of any residents at the SUBJECT PREMISES.  Between April 18, 2022, through May 24, 2022, surveillance identified a maroon Chevrolet pick-up truck with a white cap and Virginia tag XNS-483 parked in the driveway of the SUBJECT PREMISES.  A search of the Department of Motor Vehicles (DMV) records was conducted resulting in the identification of the registered owner as West End Trophies, Timberlake's employer.

41.     Surveillance of the SUBJECT PREMISES between November 1, 2022, through the present, identified a white male coming and going from the SUBJECT PREMISES. Additionally, a red Dodge pick-up truck with Virginia tags UEJ-9271, was routinely observed picking up and dropping off the white male at the SUBJECT PREMISES.  A search of the DMV records resulted in the identification of the owner of that vehicle. VEC records as of December 5, 2022, indicate that the owner of the above-described pick-up truck also works at West End Trophies and C.P. Dean as of Quarter 3, 2022.

## BACKGROUND ON CHILD PORNOGRAPHY, COMPUTERS, AND THE INTERNET

42.     I have had both training and experience in the investigation of computer-related crimes.  Based on my training, experience, and knowledge, I know the following:

a.    Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other.  Computers basically serve four functions in connection with child pornography:  production, communication, distribution, and storage.

b.    Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "Wi-Fi" or "Bluetooth."  Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone.  These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.    A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection.  Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections.  Electronic contact can be made to literally millions of computers around the world.  Child pornography can therefore be easily, inexpensively and anonymously (through electronic communications) produced, distributed, and received by anyone with access to a computer or smartphone.

d.    The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography.  Electronic storage media of various types – to include computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are

plugged into a port on the computer – can store thousands of images or videos at very high resolution.    It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices.    Some media storage devices can easily be concealed and carried on an individual's person.  Smartphones and/or mobile phones are also often carried on an individual's person.

e.    The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f.    Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide e-mail services and/or electronic storage of computer files in any variety of formats.  A user can set up an online storage account (sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet.  Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone or external media in most cases.

g.    As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional (*i.e.*, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files).  Digital information can also be retained unintentionally such as the traces

of the path of an electronic communication may be automatically stored in many

places (*e.g.*, temporary files or ISP client software, among others).  In addition to

electronic communications, a computer user's Internet activities generally leave

traces or "footprints" in the web cache and history files of the browser used.  Such

information is often maintained indefinitely until overwritten by other data.

### SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

43.    As described above and in Attachment B, this application seeks permission to

search for records that might be found on the SUBJECT PREMISES, in whatever form they are

found.  One form in which the records might be found is data stored on a computer's hard drive

or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic

storage media or, potentially, the copying of electronically stored information, all under Rule

41(e)(2)(B)

44.    I submit that if a computer or storage medium is found on the SUBJECT

PREMISES, there is probable cause to believe those records will be stored on that computer or

storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or

remnants of such files can be recovered months or even years after they have been

downloaded onto a storage medium, deleted, or viewed via the Internet.

Electronic files downloaded to a storage medium can be stored for years at little

or no cost.  Even when files have been deleted, they can be recovered months or

years later using forensic tools.  This is so because when a person "deletes" a file

on a computer, the data contained in the file does not actually disappear; rather,

that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

45.    As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.

i.   In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs)

can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.

ii.    Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.

iii.   Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs,

may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user.

iv.    Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, pieces, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.

28

Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.    I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

46.    Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards,

cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage.  I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

    a.    Searching computer systems is a highly technical process which requires specific expertise and specialized equipment.  There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software website, or operating system that is being searched;

    b.    Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;

c.      The volume of data stored on many computer systems and storage devices will

typically be so large that it will be highly impractical to search for data during the

execution of the physical search of the premises; and

d.      Computer users can attempt to conceal data within computer equipment and

storage devices through a number of methods, including the use of innocuous or

misleading filenames and extensions.  For example, files with the extension ".jpg"

often are image files; however, a user can easily change the extension to ".txt" to

conceal the image and make it appear that the file contains text.  Computer users

can also attempt to conceal data by using encryption, which means that a

password or device, such as a "dongle" or "keycard," is necessary to decrypt the

data into readable form.   In addition, computer users can conceal data within

another seemingly unrelated and innocuous file in a process called

"steganography."  For example, by using steganography a computer user can

conceal text in an image file which cannot be viewed when the image file is

opened.  Therefore, a substantial amount of time is necessary to extract and sort

through data that is concealed or encrypted to determine whether it is contraband,

evidence, fruits, or instrumentalities of a crime.

47.     Additionally, based upon my training and experience and information related to

me by agents and others involved in the forensic examination of computers, I know that routers,

modems, and network equipment used to connect computers to the Internet often provide

valuable evidence of, and are instrumentalities of, a crime.  This is equally true of so-called

"wireless routers," which create localized networks that allow individuals to connect to the

Internet wirelessly.  Though wireless networks may be "secured" (in that they require an individual to enter an alphanumeric key or password before gaining access to the network) or "unsecured" (in that an individual may access the wireless network without a key or password), wireless routers for both secured and unsecured wireless networks may yield significant evidence of, or serve as instrumentalities of, a crime—including, for example, serving as the instrument through which the perpetrator of the Internet-based crime connected to the Internet and, potentially, containing logging information regarding the time and date of a perpetrator's network activity as well as identifying information for the specific device(s) the perpetrator used to access the network.  Moreover, I know that individuals who have set up either a secured or unsecured wireless network in their residence are often among the primary users of that wireless network.

48.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

49.    Because several people share the SUBJECT PREMISES as a residence, it is possible that the SUBJECT PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those

computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

50.    I am aware that the recovery of data by a computer forensic analyst takes significant time; much the way recovery of narcotics must later be forensically evaluated in a lab, digital evidence will also undergo a similar process.  For this reason, the "return" inventory will contain a list of only the tangible items recovered from the premises.  Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

## CONCLUSION

51.    Based on the foregoing, there is probable cause to believe that the SUBJECT OFFENSES cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B, are located at the locations described in Attachment A.  I respectfully request that this Court issue a search warrant for the locations described in Attachment A, authorizing the seizure and search of the items described in Attachment B.

Kathryn Weber
Special Agent
Federal Bureau of Investigation

Sworn to by the affiant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this date:

Date: January 24, 2023

At Richmond, Virginia

/s/ MRC

Mark R. Colombell
United States Magistrate Judge

33

**ATTACHMENT A**

**DESCRIPTION OF LOCATIONS TO BE SEARCHED**

The entire property located at 2311 Homeview Drive, Henrico, Virginia 23294, including

the residential building and any outbuildings or adjacent structures (hereafter "the SUBJECT

PREMISES").  The SUBJECT PREMISES is further described as a single-family, multi-story

residence with siding on the exterior and an unpaved driveway on the left side as shown below:



**ATTACHMENT B**

**ITEMS TO BE SEIZED**

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use, or which is or has been used as the means of committing violations of federal criminal statutes including knowing distribution and receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(A), and knowing possession of, and access with intent to view, child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) ("the SUBJECT OFFENSES"):

1.     Computers or storage media used as a means to commit the violations described above.

2.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium, including Android mobile phone devices, that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a.     Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.     Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence

of the presence or absence of security software designed to detect malicious

software;

c.      Evidence of the lack of such malicious software;

d.      Evidence indicating how and when the computer was accessed or used to

determine the chronological context of computer access, use, and events relating

to the crime(s) under investigation and to the computer user;

e.      Evidence indicating the computer user's knowledge and/or intent as it relates to

the crime(s) under investigation;

f.      Evidence of the attachment to the COMPUTER of other storage devices or similar

containers for electronic evidence;

g.      Evidence of programs (and associated data) that are designed to eliminate data

from the COMPUTER;

h.      Evidence of the times the COMPUTER was used;

i.      Passwords, encryption keys, and other access devices that may be necessary to

access the COMPUTER;

j.      Documentation and manuals that may be necessary to access the COMPUTER or

to conduct a forensic examination of the COMPUTER;

k.      Records of or information about Internet Protocol addresses used by the

COMPUTER;

l.      Records of or information about the COMPUTER's Internet activity, including

firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"

web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m.    Contextual information necessary to understand the evidence described in this attachment.

3.    Routers, modems, and network equipment used to connect computers to the Internet.

4.    Child pornography and child erotica.

5.    Records, information, and items relating to violations of the statutes described above including:

a.    Records, information, and items relating to the occupancy or ownership of the SUBJECT PREMISES, 2311 Homeview Drive, Henrico, Virginia 23294, including utility and telephone bills, mail envelopes, or addressed correspondence;

b.    Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

c.    Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

d.    Records and information relating to the sexual exploitation of children, including correspondence and communications between users of Internet-based websites, messages boards, databases and discussion forums related to child exploitation; and

e.      Records and information showing access to and/or use of Internet-based websites,
messages boards, databases and discussion forums related to child exploitation.

As used above, the terms "records" and "information" includes all forms of creation or
storage, including any form of computer or electronic storage (such as hard disks or other media
that can store data); any handmade form (such as writing); any mechanical form (such as printing
or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives,
videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical,
or other high speed data processing devices performing logical, arithmetic, or storage functions,
including desktop computers, notebook computers, mobile phones, tablets, server computers, and
network hardware.

The term "storage medium" includes any physical object upon which computer data can
be recorded, including external and internal hard drives, flash drives, thumb drives, micro SD
cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage,
floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic
or optical media.

This warrant authorizes a review of electronically stored information, communications,
other records and information disclosed pursuant to this warrant in order to locate evidence,
fruits, and instrumentalities described in this warrant.  The review of this electronic data may be
conducted by any government personnel assisting in the investigation, who may include, in
addition to law enforcement officers and agents, attorneys for the government, attorney support
staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the

disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

If the government identifies seized materials, that are potentially attorney-client privileged or subject to the work product doctrine ("protected materials"), the Prosecution Team will discontinue review until a Filter Team of government attorneys and agents is established. The Filter Team will have no future involvement in the investigation of this matter. The Filter Team will review seized communications and segregate potentially protected materials, i.e., communications that are to/from an attorney, or that otherwise reference or reflect attorney advice. At no time will the Filter Team advise the Prosecution Team of the substance of any of the potentially protected materials. The Filter Team then will provide all communications that are not potentially protected materials to the Prosecution Team and the Prosecution Team may resume its review. If the Filter Team concludes that any of the potentially protected materials are not protected (e.g., the communication includes a third party or the crime-fraud exception applies), the Filter Team must obtain either agreement from defense counsel/counsel for the privilege holder or a court order before providing these potentially protected materials to the Prosecution Team. This investigation is presently covert, and the government believes that the subject of the search is not aware of this warrant.